IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:18-CV-01898-L** |
| HEARTLAND COMMUNITY ASSOCIATION, INC., | § § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant Heartland Community Association Inc.'s Motion to Dismiss for Failure to State a Claim (Doc. 7), filed October 9, 2018; Defendant's First Amended Rule 12(b)(6) Motion to Dismiss (Doc. 14), filed December 4, 2018; Plaintiff The Inclusive Communities Project, Inc.'s Response to Defendant's First Amended 12(b)(6) Motion to Dismiss (Doc. 16), filed December 21, 2018; and Defendant's Reply in Support of the First Amended Rule 12(b)(6) Motion to Dismiss (Doc. 17), filed January 4, 2019. After careful consideration of the motion, briefs, pleadings, and applicable authority, the court **denies as moot** Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 7); **grants** Defendant's First Amended Rule 12(b)(6) Motion to Dismiss (Doc. 14) and **dismisses with prejudice** this action.

### I.     Factual and Procedural Background

On July 24, 2018, the Inclusive Communities Project ("ICP" or "Plaintiff") filed this action against Heartland Community Association, Inc. ("HCA" or "Defendant"), asserting that a policy enacted by HCA in a single-family development located in an unincorporated area of Kaufman County, Texas, constitutes race discrimination in violation of 42 U.S.C. § 1982 ("§ 1982"), and

the disparate impact and disparate treatment standards under 42 U.S.C. § 3604(a) of the Fair Housing Act ("FHA"). On October 9, 2018, HCA filed a Motion to Dismiss for Failure to State a Claim (Doc. 7).[1] On October 30, 2018, ICP filed an Amended Complaint (the "Amended Complaint") (Doc. 10) pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), which allows a party to amend its pleading once as a matter of course within 21 days after service of a motion under Federal Rule of Civil Procedure 12(b). On December 4, 2018, HCA filed the Amended Rule 12(b)(6) Motion to Dismiss (Doc. 15), seeking to dismiss all claims asserted in ICP's Amended Complaint.

ICP is a nonprofit organization that assists households in seeking access to housing in predominately nonminority locations in the Dallas, Texas area. Pl.'s Am. Compl., Doc. 10 at 2. ICP's clients are predominantly Black or African American, and some of them participate in the Section 8 ("Section 8") Housing Choice Voucher Program administered by the Dallas Housing Authority ("DHA"). *Id*. at 2-3.

HCA is a nonprofit property owners' association with the authority to enact and enforce rules and regulations for Heartland, Texas, a single-family development located in Kaufman County. *Id*. at 5. HCA's authority to enact and enforce rules and regulations is set forth in the deed restrictions and covenants for each single-family property in Heartland. *Id*. at 6. On March 19, 2018, HCA enacted the policy (the "Policy") at issue in this case. *Id*. at 6-7. The Policy is codified in Section 1.5.5 of the Tenth Supplemental Certificate and Memorandum of Recording of Dedicatory Instruments for Heartland Community Association, Inc. *Id*. at 7. The purpose of Section 1.5.5 is "to establish minimum criteria by which the Owner of a Rental Property must

---

[1] As HRA subsequently filed an amended motion to dismiss in response to ICP's Amended Complaint, the court **denies as moot** HRA's Motion to Dismiss for Failure to State a Claim (Doc. 7) that addressed the allegations and claims set forth in the Original Complaint. The First Amended Rule 12(b)(6) Motion to Dismiss (Doc. 15) supersedes the first motion to dismiss.

**Memorandum Opinion and Order – Page 2**

qualify tenants and any other occupants of the Owner's Rental Property." The section sets forth three specific qualifications for rental tenants. One of the qualifications is codified in Section 1.5.5.2 and titled "No Section 8 Housing." *Id*. It provides, "A Rental Property may not be used for a publicly financed or subsidized housing program, such as Section 8 Housing." *Id*. ICP asserts that the other two requirements prohibit renting to sex offenders and tenants with a history of evictions, and, by grouping these categories of individuals with Section 8 voucher households, the Policy "directly classifies voucher participants as undesirable tenants" and "reinforces the unjustified stigma on voucher families." *Id*. at 10. ICP contends that, if an owner violates this requirement by renting to a prohibited person or household, such action is sanctionable under HCA's Violation Enforcement Policy, which authorizes the assessment of liens and court action to obtain injunctive relief and collect fines. *Id*. at 11-12.

In its first claim against HCA, ICP asserts that the Policy has a disparate impact on two Black or African-American populations: (1) the existing Section 8 voucher residents living in rentals located in Heartland and (2) any future voucher holders who may wish to apply for a rental property in Heartland. *Id*. at 10. With respect to the existing voucher residents in Heartland, ICP contends that all 96 of the families renting property in Heartland using a Section 8 voucher are Black or African American. *Id*. at 12. ICP alleges that the Policy "causes the exclusion of the current voucher group by expressly limiting the terms upon which an existing voucher lease can be renewed to households for which there is no change in occupants." *Id*. at 13. It further contends that the Policy "causes the exclusion of the current voucher group by its effect causing landlords to sell the properties currently being leased to voucher tenants rather than continue to own a unit that cannot be leased to another voucher resident once the current voucher occupant no longer leases the unit." *Id*. ICP argues that the Policy has a disparate impact on the 96 Black or African-

American families using Section 8 vouchers because, in contrast, the White non-Hispanic renters in Heartland who do not use a Section 8 voucher will not be adversely affected by the Policy. *Id*.

With respect to future voucher holders who may wish to apply for a rental property in Heartland, ICP argues that the Policy will have a disparate impact on the Black or African-American population because a high percentage of Black or African-American individuals are currently on DHA's Section 8 voucher waiting list. ICP sets forth statistics in support of its position. Specifically, as of June 13, 2017, ICP alleges that 82.8% of the households on the Section 8 voucher waiting list were Black or African American. *Id*. at 16. In contrast, ICP alleges that only 3.9% of households on the waiting list at that time were White. *Id*. As of May 31, 2018, 84.34% of the households on the waiting list were Black or African American, whereas 2.4% were White. *Id*. at 17. ICP sets forth additional race-related statistics regarding the total number of households renting property in the Dallas Metropolitan Division in 2017 and 2018, and the relative number of households seeking Section 8 assistance. *Id*. at 16-17. ICP also sets forth statistics comparing the incomes of Black or African-American renter households to White non-Hispanic renter households in the Dallas Metropolitan Division and Kaufman County. ICP argues that these statistical allegations show that the Policy "causes a greater impact on a protected class, Black or African American, than it does on White non-Hispanic households." *Id*. at 13. ICP contends that the Policy "sets a preference for higher income non Section 8 voucher households that can afford to rent a single family home in Heartland." *Id*. at 22.

In addition to asserting a disparate impact claim, ICP contends that the Policy violates the disparate treatment standard under the FHA and § 1982 because HCA allegedly had a discriminatory intent in adopting it. ICP contends that HCA harbors a racially-discriminatory motive with respect to current Section 8 voucher holders in Heartland because all of them are

**Memorandum Opinion and Order – Page 4**

currently Black or African American. *Id*. at 24. It alleges that HCA harbors a racially discriminatory motive with respect to future applicants of rental properties seeking to use a Section 8 voucher because the population of applicants in the Dallas Metropolitan Division is disproportionately Black or African American. *Id*. at 26-27. ICP contends, "The fact that DHA's voucher program and the other Section 8 voucher programs in the Dallas Metropolitan Division are predominantly Black or African American is common knowledge," and "[t]he exclusionary effect of this disproportionately Black or African[-]American group [as a result of the Policy] is foreseeable." *Id*. at 28. In asserting that HCA had a discriminatory intent in enacting this Policy, ICP alleges that HCA "began to consider the policy in 2018 after the number of Black or African[-]American DHA Section 8 voucher households increased from 0 in 2013 to 72 in 2017," and "doubled from 2016 to 2017." *Id*. at 28-29. It contends, "While this increase did not substantially affect the racial composition of Heartland, it was a significant increase in the number of Black renter households in Heartland," and "[t]aking action to exclude Black tenants from a majority White non-Hispanic community after a significant increase in the number of those tenants shows discriminatory intent." *Id*. at 29.

ICP contends that, prior to filing this lawsuit, ICP asked HCA for its purpose in adopting the Policy prohibiting rentals to Section 8 housing voucher holders, and they "gave no reason[s]." *Id*. at 26. ICP alleges that "[t]he failure to give any reason for the absolute prohibition against renting to Section 8 voucher households is consistent with the existence of an illegal purpose that the defendant did not want to disclose." *Id*. at 29. ICP further alleges that, "[g]iven the racially discriminatory result of the action, it is a reasonable inference that the illegal purpose is the deliberate exclusion of Black tenants because of their race." *Id*. at 10. ICP notes that HCA, in its "Rental Amendment Questions and Answers" explaining the proposed Policy, stated in part that:

> [W]e believe too many rental properties will reduce the homeowner's ability to feel like a large, tight knit community and reduces the number of people willing to serve on Committees/Boards and local school's PTA/PTO and may have a long-term impact on the community in which they live.

*Id*. at 25-26.

In its Motion to Dismiss, HCA argues that, with respect to the disparate impact claim asserted under the FHA, ICP has failed to meet the Supreme Court's robust causality requirement set forth in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* 135 S. Ct. 2507 (2015). HCA argues that, pursuant to the robust causality requirement, ICP is required to plead facts showing that the Policy caused the statistical disparity in the allegedly impacted geographical area. Def.'s Mot. to Dismiss, Doc. 15 at 16. HCA argues that ICP has merely shown that "a disproportionately higher number of Black or African-American households participate in the Section 8 program." *Id*. at 16. It argues that these allegations fall short of the causality requirement because:

> Nowhere does ICP contend that the Policy caused more Black or African-Americans than White non-Hispanics to be on the DHA's Section 8 waiting list, caused more Black or African-Americans than White non-Hispanics to participate in the Section 8 program, caused more Blacks or African-Americans than White non-Hispanics to be eligible for Section 8 vouchers, or caused a disproportionate number of Black or African-American renter households to be part of the Section 8 program.

*Id*. at 16. HCA notes that the Supreme Court established the causality requirement because it "wants to protect defendants from abusive disparate-impact claims so that race would not be used and . . . cause defendants to be liable for racial disparities that they did not create." *Id*. (citing *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2524).

With respect to ICP's disparate treatment claim asserted under the FHA, HCA first argues that ICP's claim solely relies on allegations that the Policy will disproportionately affect more

Black or African-American households, and it is, therefore, "really ICP's disparate impact claim recast as a disparate treatment claim." *Id*. at 19-20. HCA next argues that the Policy is "racially neutral and applies to all Section 8 voucher recipients regardless of race," and ICP does not set forth factual allegations that HCA had a racially-discriminatory motive in enacting it. *Id*. at 20. HCA next argues that the claim should be dismissed because ICP relies on circumstantial evidence of discriminatory intent or motive that does not adequately establish a prima facie case of discrimination. *Id*. at 18. HCA contends that ICP solely relies on "subjective and unsupported assumptions," such as the allegation that the Policy classifies voucher participants as undesirable tenants and reinforces an unjustified stigma on voucher families by including them as one of three categories of rental applicants, the two other prohibited groups being sex offenders and tenants with a history of evictions. *Id*. at 20-21 (citing Pl.'s Am. Compl., Doc. 10 at 10). HCA argues that, per the text of the Policy, there are no pejorative references made to Section 8 tenants and any stigma perceived by ICP "exists solely within ICP's subjective reading of the Policy." *Id*. at 21. HCA further argues that ICP fails to allege that HCA had knowledge that DHA's Section 8 voucher program participants are predominantly Black or African-American. *Id*. at 22. It argues that ICP assumes, without providing support, that racial motivations must have been the reason for the Policy due to the increased number of DHA Section 8 voucher households in Heartland. *Id*. HCA argues that these conclusory allegations are insufficient to set forth circumstantial evidence of discriminatory intent to plead a disparate treatment claim.

With respect to ICP's § 1982 claim, HCA argues that ICP has failed to allege that HCA had a discriminatory intent in enacting the Policy, as required to plead both a § 1982 claim and a disparate treatment claim under the FHA. HCA argues that "ICP has not pleaded sufficient facts to show that Heartland knew the number or racial make-up of the Section 8 tenants living in

Heartland or knew the racial composition of those who would qualify for renting units in Heartland." *Id*. at 15. It argues that, "ICP has also not pleaded facts to show that race was considered at all in the decision to enact the racially-neutral Policy." *Id*. Lastly, HCA argues that "ICP's statistics also do not support any inference of discrimination because these statistics only show that a disproportional number of Black and African-American households participate in the Section 8 program." *Id*. In light of the paucity of allegations that HCA had a discriminatory intent, HCA argues that ICP's disparate treatment claim should be dismissed for failing to state a claim upon which relief can be granted.

## II.     Rule 12(b)(6) – Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (quotation marks, citations, and footnote omitted). When the allegations of the pleading

do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint and not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth."

*Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

## III. Analysis

### A. Disparate Impact Claim Pursuant to 42 U.S.C. § 3604(a)

In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court held that 42 U.S.C. § 3604(a) of the FHA encompasses disparate-impact claims. 135 S. Ct. at 2518. In discussing the role of disparate-impact liability under the FHA, the Court noted that "disparate-impact liability may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping." *Id.* at 2522. In recognizing disparate-impact liability as cognizable under the FHA, the Court was careful to explain that disparate-impact liability should be "properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a

showing of a statistical disparity." *Id*. In defining the parameters of pleading a disparate impact based on a statistical disparity, the Court stated that such claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id*. at 2523. "A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id*. (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989), *superseded by statute on other grounds* (internal quotation marks omitted)). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id*. "If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability." *Id*. at 2514. "Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Id*. at 2524.

In a recently-published opinion, the Fifth Circuit defined the applicable burden-shifting test for determining disparate-impact claims asserted under the FHA. *Inclusive Communities Project v. Lincoln Prop. Co.*, 920 F.3d 890, 901 (5th Cir. 2019). "[A] plaintiff must first prove a prima facie case of discrimination by showing that the challenged practice causes a discriminatory effect." *Id*. (citing 24 C.F.R. § 100.500(c)(1)). "If the plaintiff makes a prima facie case, the defendant must then prove that the challenged practice is necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests." *Id*. (citing 24 C.F.R. § 100.500(c)(2)). "If the defendant meets its burden, the plaintiff must then show the defendant's interests could be served by another practice that has a less discriminatory effect." *Id*. at 901-02 (citing 24 C.F.R. § 100.500(c)(3)). In setting forth this test, the Fifth Circuit noted that the strict

robust causation[2] requirement set forth in *Texas Department of Housing and Community Affairs* made clear that the Court intended to limit the nature of a disparate impact claim asserted pursuant to the FHA. *Id*. at 903.

The Fifth Circuit noted, however, that the Court "did not clearly delineate [the] meaning or requirements" of the robust causation requirement. *Id*. The court addressed four views of "robust causation" set forth by the Eighth Circuit, Fourth Circuit, and Eleventh Circuit. *Id*. at 904-05 (discussing *Ellis v. City of Minneapolis*, 860 F.3d 1106, 114 (8th Cir. 2017); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018); and *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 F. App'x 828, 833-35, No. 17-14254, 2018 WL 6822693, at *4 (11th Cir. Dec. 28, 2018)).[3] Without specifically adopting either one of the four positions, the Fifth Circuit in *Lincoln Property* concluded that the district court correctly dismissed ICP's claims based on a failure to plead sufficient facts to meet the robust causation requirement. *Id*. at 906. In its reasoning, the court wrote about the failure of ICP's statistics to meet the causation requirement at the pleading stage:

> Neither the aforementioned "city level data" nor the "census-level data" cited by ICP supports an inference that the implementation of Defendants-Appellees' blanket "no vouchers" policy, or any change therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area (or any of the other census areas discussed by ICP). Similarly, ICP alleges no facts supporting a

---

[2] In *Texas Department of Housing and Community Affairs*, the Supreme Court refers to the standard as the "robust causality" requirement, whereas the Fifth Circuit in *Lincoln Property* uses the term "robust causation." The court considers these two terms to be synonymous and prefers to use the term "robust causation."

[3] The first view in *Ellis* requires a plaintiff's allegations to "point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity." *Ellis*, 860 F.3d at 1114. The second view set forth by the majority opinion in *Reyes* relies on the position that "statistical disparities must be sufficiently substantial that they raise [the necessary] inference of causation." *Reyes*, 903 F.3d at 425, 428-29 (citation omitted). The third view provided by a dissenting opinion in *Reyes* notes that the robust causation requirement is not satisfied based on statistical disparities that preexisted the policy, as preexisting disparities cannot logically be characterized as the consequence of a policy. *Id*. at 434-45. The fourth view in *Oviedo* emphasizes that racial imbalance alone cannot establish prima facie disparate impact, focusing on the policy ramifications of such a rule: "If a disparate impact claim could be found on nothing more than a showing that a policy impacted more members of a protected class than nonmembers of protected classes, disparate impact liability undeniably would overburden cities and developers." *Oviedo*, 759 F. App'x at 834.

**Memorandum Opinion and Order – Page 12**

> reasonable inference that Defendants-Appellees bear any responsibility for the geographic distribution of minorities throughout the Dallas area prior to the implementation of the "no vouchers" policy. Indeed, ICP pleads no facts showing that Dallas's racial composition before the Defendants-Appellees implemented their "no vouchers" policy or how that composition has changed, if at all, since the policy was implemented.

*Id*. at 907. The court further stated:

> A private entity's choice to opt out of participation in a government program that is *voluntary* under both federal and Texas law cannot be artificial, arbitrary, and unnecessary absent the existence of pertinent, contrary factual allegations sufficiently rendering a plaintiff's claimed entitlement to disparate impact relief plausible, rather than merely conceivable or speculative.

*Id*.

Relying on the clear guidance of these decisions, the court determines that ICP has failed to meet the robust causation requirement necessary to plead its disparate impact claim. ICP exclusively pleads and relies on statistics to attempt to show that the Black or African American population—including the current rental tenants living in Heartland, as well as prospective future applicants in the Dallas Metropolitan Division using Section 8 vouchers—is disproportionately affected by the Policy as a matter of law. ICP does not set forth any allegations that HCA's Policy either: (1) caused the racial make-up of the 96 current rental tenants using Section 8 vouchers, or (2) caused the racial make-up of DHA's Section 8 voucher waiting list. A disparate-impact liability claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2523.

In its Response, ICP argues that it has sufficiently pleaded the disparate impact claim by showing that the Policy will perpetuate racial segregation. Pl.'s Resp., Doc. 16 at 15. ICP further argues, "No case applying the because of race disparate impact standard under either statute [of the Fair Housing Act and Title VII of the 1964 Civil Rights Act] requires a showing that the

**Memorandum Opinion and Order – Page 13**

challenged policy also caused the racial and other demographic characteristics of the population in the group disadvantaged by the policy." *Id*. at 18. This contention, however, is contrary to the robust causation requirement set forth by the Supreme Court in *Texas Department of Housing and Community Affairs* and followed by the Fifth Circuit in *Lincoln Property Company*. Moreover, in arguing that a disparate treatment claim may be based on allegations regarding the perpetuation of racial segregation in a community, ICP relies in part on a Second Circuit case issued in 1988, *Huntington Branch N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2nd Cir. 1988), which precedes the controlling jurisprudence relied upon in this opinion. The Fifth Circuit has expressly *rejected* the Second Circuit's reasoning in *Huntington Branch* that assertions of harm to the community by perpetuation of segregation can establish disparate-impact liability because adopting such a position "would effectively mandate a landlord's participation in the voucher program any time the racial makeup of multi-family rental complex does not match the demographics of a nearby metropolitan area." *Lincoln Prop. Co.*, 920 F.3d at 908-09. The court reasoned that such a result "would be contrary to the cautionary standards that the Supreme Court has declared to be necessary both in evaluating a prima facie case and in ordering any remedial action[.]" *Id*. at 909 (citing *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2524).

Rather than sufficiently allege a causal link between the Policy and statistical disparities as required by the robust causation standard, ICP repeatedly argues that the Policy violates the disparate impact standard because the individuals affected by it are the Black or African-American voucher holders living in Heartland who will "eventually [be] removed" because of the Policy, as well as Black or African-American individuals listed on DHA's Section 8 waiting list who will not be able to rent a home and live in Heartland in the future. Pl.'s Resp., Doc. 16 at 14. These arguments do not address the key issue of whether there are factual allegations from which the

court can reasonably infer that the Policy is causing the statistical racial disparities in Heartland. The statistical racial disparities relied upon by ICP preexisted the enactment of the Policy and, therefore, cannot be shown to have been caused by it. The court, accordingly, determines that ICP has failed to plead adequately the first step of the burden-shifting analysis that requires a prima facie showing that the challenged practice causes a discriminatory effect and, therefore, will grant HCA's motion to dismiss ICP's disparate impact claim. The court's ruling follows the previously-cited authority that sets forth clear pleading requirements for disparate-impact claims to be supported by specific allegations regarding statistical evidence. This same authority also cautions courts to "avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2524.

### B.    Disparate Treatment Claim Pursuant to 42 U.S.C. § 3604(a) and 42 U.S.C. § 1982[4]

"Disparate treatment" is "deliberate discrimination." *Lincoln Prop Co.*, 920 F.3d at 909. "It refers to treating some people 'less favorably than others because of a protected trait.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). "Such discrimination is shown by evidence of discriminatory action or by inferences from the fact of differences in treatment." *Id.* (citation omitted). "With discriminatory treatment claims, there can be no liability without a finding that the protected trait (*e.g.*, race) motivated the challenged action." *Id.* (citations omitted). "In the absence of direct evidence, claims of disparate treatment are evaluated using the burden-shifting evidentiary standard established for discrimination cases based on circumstantial evidence." *Id.* at 910.

---

[4] Section 1982 provides, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.

**Memorandum Opinion and Order – Page 15**

To state a claim for disparate treatment under § 3604(a) of the FHA, a plaintiff must allege facts supporting a prima facie case of: "(1) membership in protected class, (2) that the plaintiff applied and was qualified to rent or purchase housing, (3) that the plaintiff was rejected, and (4) that the housing thereafter remained open to similarly situated applicants after the plaintiff was rejected." *Id*. at 910-11. "If a prima facie case is alleged, a defendant may offer a legitimate, non-discriminatory reason for the rejection." *Id*. at 911. "The burden then shifts back to the plaintiff to rebut the reason offered by the defendant by showing it is a pretext for discrimination." *Id*.

"[T]hat certain facts may be cited in support of both a disparate treatment and impact claim does not automatically cause one claim to supersede the other." *Id*. at 910. "Recognition of disparate-impact liability under the FHA also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2513.

Insofar as HCA argues that ICP's disparate treatment claim must be dismissed because it is wholly based on allegations relied upon in pleading its disparate impact claim, the court rejects that argument because the two claims are not mutually exclusive, even when they rely on similar factual allegations, and a showing of disproportionate impact "may provide an important starting point" for setting forth that a policy was motivated by a discriminatory purpose. *See id.; see also Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

The court, however, determines that ICP failed to allege facts sufficient to support a reasonable inference of intentional race discrimination. The Fifth Circuit in *Lincoln Property* succinctly came to the same conclusion in determining whether a "no voucher tenants" policy was motivated by race discrimination:

> In this instance, the vague and conclusory allegations of disparate treatment that ICP asserts collectively against Defendants-

**Memorandum Opinion and Order – Page 16**

> Appellees are legally insufficient to support a reasonable inference of intentional race discrimination. In short, ICP essentially asks the panel to automatically view a "no voucher tenants" policy as synonymous with a "no black tenants" policy without providing adequate (well-pleaded) factual support for that linkage (as opposed to conclusory statements and assertions based on speculation, assumptions, and stereotypes). Defendants-Appellees' presumed awareness that the voucher population in the Dallas metro area is disproportionately black cannot alone be enough.

*Lincoln Prop. Co.*, 920 F.3d at 911. The court finds the Fifth Circuit's analysis in *Lincoln Property* to be controlling regarding the sufficiency of Plaintiff's pleadings. Likewise, in its Amended Complaint and Response, ICP bases its disparate treatment claim on conclusory allegations that the Policy "was based at least in part on racial considerations intended to disadvantage persons because of those persons' race." Pl.'s Resp., Doc. 16 at 26. ICP further bases its claim on the allegation that "the group excluded by the Policy includes only Blacks or African Americans[,] which is a clear pattern that weighs heavily to show purpose." *Id*. at 28. ICP contends, "The fact that FHA's voucher program and the other Section 8 voucher program in the Dallas Metropolitan Division are predominantly Black or African American is common knowledge." Pl.'s Am. Compl., Doc. 10 at 28. These are the precise conclusory, conjectural, and speculative allegations that the Fifth Circuit rejected in *Lincoln Property*. As ICP failed to make a prima facie showing of discriminatory intent, the court cannot reasonably infer that HCA is liable for the conduct alleged by ICP. The court, accordingly, determines that ICP has failed to allege sufficiently that HCA had a racially discriminatory motive in enacting the Policy and, therefore, will grant HCA's motion to dismiss ICP's disparate treatment claim asserted pursuant to the FHA and § 1982, as ICP has failed to state a claim upon which relief can be granted.

### C. Amendment of Pleadings

ICP does not request to amend its pleadings in its Response in the event the court determines that it has failed to state a claim upon which relief can be granted. As previously noted, ICP has already amended its pleadings once as a matter of course as permitted by Federal Rule of Civil Procedure 15(a)(1)(B), following the filing of HCA's first Motion to Dismiss.

The provision of Rule 15(a)(2) of the Federal Rules of Civil Procedure that states "[t]he court should freely give leave when justice so requires" is not without limitation. The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citation omitted). In determining whether to allow an amendment of the pleadings, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted).

In this action, the court concludes that ICP has stated its best case[5] and that it does not have additional facts to plead a claim upon which relief can be granted. The court so concludes for two reasons. First, as previously stated, ICP did not request an opportunity to amend its pleadings if the court found them to be deficient. In other words, by not requesting an opportunity to amend, Plaintiff necessarily stands on the strength and sufficiency of its pleadings. Second, the Fifth Circuit issued its opinion in *Lincoln Property* on April 9, 2019, and Plaintiff was fully aware of

---

[5] The Fifth Circuit has held that "at some point a court must decide that a plaintiff has had fair opportunity to make [its] case; if after that time, a cause of action has not been established, the court should finally dismiss the suit." *Schiller*, 342 F.3d at 567 (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)).

**Memorandum Opinion and Order – Page 18**

the opinion and its ramifications.[6] Thus, Plaintiff has had a fair opportunity to make its case or request leave to amend. The only logical inference that the court can make is that Plaintiff realized that it cannot replead in a manner to meet the requirements set forth in *Lincoln Property* and, thus, did not request to amend because such amendment would have been futile. The court, therefore, concludes that Plaintiff has stated its best case. Further amendment would be futile and cause unnecessary and undue delay with respect to the resolution of this action. The court, accordingly, will not allow ICP an opportunity to get three "bites at the apple."

## IV. Conclusion

For the reasons herein stated, the court **denies as moot** Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 7); **grants** Defendant's First Amended Rule 12(b)(6) Motion to Dismiss (Doc. 14) and **dismisses with prejudice** this action. As required by Federal Rule of Civil Procedure 58, the court will issue its judgment by separate document.

**It is so ordered** this 7th day of August, 2019.

Sam A. Lindsay
United States District Judge

---

[6] The court notes that Plaintiff's counsel in *Lincoln Property* is the same counsel for Plaintiff in this case.

**Memorandum Opinion and Order – Page 19**