# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 10, 2020

Lyle W. Cayce
Clerk

No. 19-10991

THE INCLUSIVE COMMUNITIES PROJECT, INCORPORATED,

> Plaintiff - Appellant

v.

HEARTLAND COMMUNITY ASSOCIATION, INCORPORATED,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-1898

Before BARKSDALE, HAYNES, and WILLETT, Circuit Judges.

PER CURIAM:[*]

The Inclusive Communities Project, Inc. (ICP), challenges the dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6) (failure to state claim), of its action claiming:  disparate-impact race discrimination, in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3604(a) (prohibiting discrimination in sale or rental of housing); and disparate-treatment race discrimination, in violation of § 3604(a) and 42 U.S.C. § 1982 (guaranteeing same property rights enjoyed

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 19-10991

by "white citizens" to "[a]ll citizens"). Primarily at issue is whether the district court's concluding plaintiff failed to state a claim for disparate-impact or disparate-treatment race discrimination is controlled by our court's decision affirming a dismissal pursuant to Rule 12(b)(6), in the same posture and involving the same plaintiff as is in this action: *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir.), *petition for reh'g denied*, 930 F.3d 660 (5th Cir. 2019), *cert. denied*, 2020 WL 1325844 (U.S. 23 Mar. 2020) (*Lincoln Property*).  AFFIRMED.

## I.

As discussed *infra*, because this action was dismissed pursuant to Rule 12(b)(6), we consider only the following well-pleaded allegations of the operative amended complaint.  *E.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

The federal Section 8 housing-voucher (voucher) program provides subsidies to landlords who rent to voucher holders by paying the difference between required rent and the amount voucher holders can pay.  *See generally* 42 U.S.C. § 1437f(o) (outlining voucher program).  In the area encompassing Heartland, Texas, the Dallas Housing Authority (DHA) administers the voucher program.  Among DHA voucher holders, 84% are black.  Black persons also comprise approximately 84% of the DHA voucher waiting list.

ICP is a non-profit organization that assists DHA voucher holders' choosing dwelling units in predominately non-minority areas.  ICP asserts its assistance is necessary because landlords are often unwilling to rent units in these areas to voucher families (regardless of race), resulting in their living in racially segregated areas.

Heartland, located in an unincorporated area of Kaufman County, Texas (approximately 30 miles southeast of Dallas), is a majority white, single-family

development of approximately 2,000 houses. In other words, there are no multi-family houses in the development. At this action's initiation, 96 voucher families lived there; each was black.

Heartland Community Association, Inc. (HCA), is a non-profit property-owners' association with the authority to enact and enforce regulations for Heartland. On 19 March 2018, it enacted restrictions on the rental of Heartland houses. The restrictions were enacted after the number of voucher families in Heartland doubled in 2017. These restrictions limit the number of rental properties each houseowner may own and require landlords to occupy the houses for more than 12 consecutive months before their becoming rentals. Further, the specific policy at issue (the policy) forbids renting to, *inter alia*: sex offenders; tenants with a history of evictions; and voucher holders. In addition to preventing future voucher holders from renting in Heartland, the policy prevents current voucher holders from renewing their leases subsequent to a change in the makeup of a house's occupancy, such as after a child is born or a married couple divorces. Violation of the policy is sanctionable under a violation-enforcement policy authorizing, *inter alia*, a court action to obtain injunctive relief and collect fines.

Seeking to enjoin the policy's enforcement, ICP filed this action in July 2018. Regarding the policy's effect on Heartland's current voucher households and those voucher holders who would choose to live in Heartland absent the policy, ICP's operative amended complaint claimed the policy constituted disparate-impact race discrimination, in violation of 42 U.S.C. § 3604(a) (prohibiting discrimination in sale or rental of housing), and disparate-treatment race discrimination, in violation of § 3604(a) and 42 U.S.C. § 1982 (guaranteeing same property rights enjoyed by "white citizens" to "[a]ll citizens"). In response, HCA moved to dismiss, pursuant to Rule 12(b)(6), for

No. 19-10991

failure to state a claim.  For the following reasons, on 7 August 2019 the district court granted the motion in a well-reasoned, comprehensive opinion.  *Inclusive Cmtys. Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657 (N.D. Tex. 2019).

Regarding disparate impact, the court recognized that the Supreme Court, in another action involving ICP, *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015) (*TDH*), "held . . . 42 U.S.C. § 3604(a) of the FHA encompasses [such] claims".  *Heartland Cmty. Ass'n*, 399 F. Supp. 3d at 665.  The district court stated, however, that *TDH* "was careful to explain that disparate-impact liability should be 'properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA . . . if such liability were imposed based solely on a showing of a statistical disparity'".  *Id.* at 666 (quoting *TDH*, 135 S. Ct. at 2522).  The district court recognized that, in order to cabin disparate-impact liability, the Supreme Court imposed "[a] robust causality requirement" to "ensure[]that racial imbalance does not, without more, establish a prima facie case of disparate impact".  *Id.* (quoting *TDH*, 135 S. Ct. at 2523).  (Regarding ICP's disparate-treatment claim on appeal here, such a claim was not at issue in *TDH*.  *See TDH*, 135 S. Ct. at 2513.)

The district court proceeded to analyze ICP's disparate-impact claim in the light of our court's post-*TDH*, 2019 decision in *Lincoln Property*, discussed *infra*.  *Heartland Cmty. Ass'n*, 399 F. Supp. 3d at 666–68.  Recognizing that our court in *Lincoln Property* did not decide the test to determine whether plaintiff has established a *prima facie* case of disparate-impact liability, the district court nonetheless determined ICP's claim failed in the light of *Lincoln Property*.  *Id.*  In that regard, the district court concluded ICP failed to plead adequately a *prima facie* disparate-impact claim because it did not allege the

4

policy "(1) caused the racial make-up of the 96 current rental tenants using Section 8 vouchers, or (2) caused the racial make-up of DHA's Section 8 voucher waiting list"; and, along that line, "[t]he statistical racial disparities relied upon by ICP preexisted the [March 2018] enactment of the [p]olicy and, therefore, cannot be shown to have been caused by it". *Id.* at 667–68.

As for ICP's disparate-treatment claim, the court, after providing the elements required to state such a claim under the FHA, concluded "the Fifth Circuit's analysis in *Lincoln Property* . . . controll[ed]". *Id.* at 669. Because ICP based its claim on "the precise conclusory, conjectural, and speculative allegations . . . rejected" by our court in *Lincoln Property*, the district court concluded: "ICP . . . failed to allege sufficiently that HCA had a racially discriminatory motive"; and, therefore, ICP failed to state a claim for disparate treatment under both the FHA and 42 U.S.C. § 1982. *Id.* at 670.

Finally, the district court addressed whether it should allow ICP to amend its pleadings. The court stated: "ICP [did] not request to amend [them] in the event [this] court determine[d] it ha[d] failed to state a claim upon which relief can be granted"; and "ICP ha[d] already amended its pleadings once as a matter of course". *Id.* Further, the court noted our court's opinion in *Lincoln Property* was issued on 9 April 2019, giving ICP time to become "fully aware of the opinion and its ramifications" and giving it "a fair opportunity to make its case or request leave to amend". *Id.* at 670–71. The district court concluded, based on these facts, "[t]he only logical inference [it could] make [was] that [ICP] realized that it [could not] replead in a manner to meet the requirements set forth in *Lincoln Property* and . . . did not request to amend because such amendment would have been futile". *Id.* at 671. Declining to give ICP "three bites at the apple", the district court dismissed ICP's action with prejudice. *Id.* (internal quotation marks omitted).

No. 19-10991

## II.

In this appeal, ICP likewise does not request an opportunity to amend its complaint. Instead, it contends: *Lincoln Property* should be reversed or modified regarding its requirements for disparate-impact liability; it should also be modified to protect private owners' (landlords) rights; and the amended complaint stated a plausible disparate-treatment claim for purposes of Rule 12(b)(6). For the following reasons, each claim fails.

Under the familiar Rule 12(b)(6) standard, we review *de novo* the district court's dismissal. *E.g.*, *Clyce v. Butler*, 876 F.3d 145, 148 (5th Cir. 2017) (citation omitted). To survive dismissal at this stage, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face", which requires "plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged". *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted). "[O]nly a claim that states a plausible claim for relief survives a motion to dismiss". *Id*. at 679 (citation omitted).

The FHA prohibits the "refus[al] to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race". 42 U.S.C. § 3604(a). As stated, the Supreme Court held in *TDH* that this subsection permits disparate-impact claims. 135 S. Ct. at 2518. The purpose of such disparate-impact liability is to address facially neutral policies with "disproportionately adverse effect[s] on minorities[, which] are otherwise unjustified by a legitimate rationale". *Id.* at 2513 (internal quotation marks and citation omitted).

In holding that disparate-impact liability is available, and as discussed *supra*, the Court emphasized "a disparate-impact claim that relies on a

6

No. 19-10991

statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity". *Id.* at 2523. The Court proceeded to explain that this "robust causality requirement ensures that racial imbalance . . . does not, without more, establish a prima facie case of disparate impact", "thus protect[ing] defendants from being held liable for racial disparities they did not create". *Id.* (alteration, internal quotation marks, and citation omitted). (As stated, the Court in *TDH* was not presented with a disparate-treatment claim and did not address the requirements for such a claim. *See id.* at 2513.)

As also noted, our court interpreted *TDH* in *Lincoln Property*. There, ICP alleged apartment complexes' declining to participate in the voucher program constituted both disparate impact and disparate treatment because more voucher holders in the relevant area were black than were white. 920 F.3d at 895–97, 901 (reviewing dismissal pursuant to Rule 12(b)(6) (failure to state claim)).

In discussing *TDH*, our court first acknowledged that *TDH*, on *certiorari* to the Supreme Court from our circuit, affirmed our court's application of the Department of Housing and Urban Development's (HUD) burden-shifting approach in deciding disparate-impact claims under the FHA. *Id.* at 901–02. Pursuant to the HUD framework, plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect". 24 C.F.R. § 100.500(c)(1). Defendant then "has the burden of proving that the challenged practice is necessary to achieve one or more [of defendant's] substantial, legitimate, nondiscriminatory interests". *Id.* § 100.500(c)(2). If defendant does so, the "plaintiff may still prevail upon proving that [these interests] could be served by another practice that has a less discriminatory effect". *Id.* § 100.500(c)(3). (It goes without saying that, at the Rule 12(b)(6)

No. 19-10991

stage, plaintiff need only plausibly allege sufficient facts to allow a reasonable inference plaintiff will be able to satisfy this first prong.)

After providing the HUD framework, our *Lincoln Property* court explained that "the Supreme Court never explicitly stated that it adopted" that framework. 920 F.3d at 902. Acknowledging the circuits are split and "debate exists" on whether *TDH* adopted the HUD regulations, our court declined to read *TDH* to do so. *Id.* at 902, 904–05 (referencing *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th Cir. 2018) (noting similarity between *TDH* and HUD frameworks and declining to determine whether "meaningful differences" exist between them), *cert. denied*, 139 S. Ct. 2026 (2019); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) (citation omitted) (interpreting *TDH* as adopting HUD framework)).

In contrast to the second and fourth circuits, our *Lincoln Property* court, referencing an unpublished Minnesota district-court opinion's analysis of *TDH*'s robust-causality requirement, which the fourth circuit cited for the alternative proposition that "some courts believe the Supreme Court implicitly adopted the HUD framework altogether", *see Reyes*, 903 F.3d at 424 n.4 (citation omitted), "read the Supreme Court's opinion in [*TDH*] to undoubtedly announce a more demanding test than that set forth in the HUD regulation", *Lincoln Property*, 920 F.3d at 902 (referencing *Crossroads Residents Organized for Stable & Secure Residencies v. MSP Crossroads Apartments LLC*, No. 16-223, 2016 WL 3661146, at *6 (D. Minn. 5 July 2016)). Concluding "the Supreme Court's language in [*TDH*] is stricter than the regulation itself", our court ruled it was "bound to apply the stricter version of the burden-shifting analysis". *Id.* at 903 (citation omitted).

The *Lincoln Property* court then examined four different interpretations, from three circuits, for what is necessary to satisfy *TDH*'s robust-causality

No. 19-10991

requirement, illustrating disagreement among the circuits. *See id.* at 903–05. These differing approaches follow.

First, the court examined "*Ellis v. City of Minneapolis*, in which the Eighth Circuit construed [*TDH*] to require that a plaintiff's allegations point to an artificial, arbitrary, and unnecessary policy causing the problematic disparity, in order to establish a prima facie disparate impact case". *Id.* at 904 (internal quotation marks omitted) (citing *Ellis v. City of Minneapolis*, 860 F.3d 1006, 1114 (8th Cir. 2017)). To succeed under this test, the complaint "must . . . allege facts plausibly demonstrating that the [policies] complained of are arbitrary and unnecessary under the FHA". *Id.* (citing *Ellis*, 860 F.3d at 1112).

Next, our court examined the fourth circuit's majority opinion in *Reyes*, requiring plaintiff plausibly allege "statistical disparities . . . sufficiently substantial that they raise [the necessary] inference of causation". *Id.* (second alteration in original) (citing *Reyes*, 903 F.3d at 425). In that case, the fourth-circuit majority held "plaintiffs had properly stated a prima facie disparate impact case by alleging that the . . . first-time enforcement of a previously unenforced policy . . . 'caused a disproportionate number of [minorities] to face eviction . . . compared to the number of non-[minorities] who faced eviction'". *Id.* (quoting *Reyes*, 903 F.3d at 428).

Our court then discussed "[t]he third construction of 'robust causation' . . . provided by [the dissent] in *Reyes*", requiring plaintiffs plausibly allege "defendants' policy caused the statistical disparity that they challenge", *i.e.*, that "defendants' policy . . . caused [the relevant minority group] to be the dominant group" affected. *Id.* at 904–05 (quoting *Reyes*, 903 F.3d at 434–35 (Keenan, J., dissenting)). Under this construction, "robust causation [is] not satisfied by pre-existing conditions . . . *not* brought about by the challenged policy". *Id.* at 905 (emphasis in original).

9

No. 19-10991

Finally, our court addressed "[t]he fourth view of robust causation", that of the eleventh circuit in *Oviedo Town Center II, L.L.L.P. v. City of Oviedo*, 759 F. App'x 828, 833–35 (11th Cir. 2018) (reviewing grant of summary judgment). *Id.* at 905. Our court stated that, in *Oviedo*, the eleventh circuit interpreted *TDH* "as promulgating *detailed causation requirements* as a means of *cabining* disparate impact liability" and required plaintiff "establish a disparate impact [with a] causal connection with the policy at issue". *Id.* at 905 (emphasis in original) (alteration, internal quotation marks, and citations omitted).

Without deciding which test applies in our circuit, our *Lincoln Property* court held plaintiff "fail[ed] to allege facts sufficient to provide the robust causation necessary for an actionable disparate impact claim . . . under any of the [four] analyses of robust causation discussed above". *Id.* at 906. Our court ruled plaintiff failed to satisfy the tests set forth by both *Reyes* opinions and *Oviedo* because plaintiff failed to plead allegations "support[ing] an inference that the implementation of [the challenged] blanket 'no vouchers' policy, or any change therein, caused black persons to be the dominant group of voucher holders in the [relevant] area". *Id.* at 907. Further, the court ruled plaintiff failed to satisfy the eighth circuit's requiring that a policy be "artificial, arbitrary, and unnecessary" because a private party's decision not to participate in a voluntary government program "cannot be artificial, arbitrary, and unnecessary absent the existence of pertinent, contrary factual allegations sufficiently rendering a plaintiff's claimed entitlement to disparate impact relief plausible, rather than merely conceivable or speculative". *Id.* at 907.

The dissent in *Lincoln Property* from our court's holding plaintiff failed to state a *prima facie* disparate-impact claim, *id.* at 912–25 (Davis., J., concurring in part and dissenting in part), discussed the differing interpretations of *TDH* applied by the majority and then urged the majority's

No. 19-10991

requiring plaintiff to plausibly allege defendants were responsible for the underlying disparity in the racial composition of voucher holders "would render disparate-impact liability under the FHA a dead letter", *id.* at 924.

As for ICP's disparate-treatment claim in *Lincoln Property*, our court concluded, without dissent, that ICP failed to state a plausible claim for relief. *Id.* at 910 (majority opinion), 912–13 (Davis, J., concurring in part and dissenting in part). After noting that "[d]isparate treatment is deliberate discrimination", our court explained that, "[i]n the absence of direct evidence, claims of disparate treatment are evaluated utilizing the burden-shifting evidentiary standard established for discrimination cases based on circumstantial evidence". *Id.* at 909–10 (internal quotation marks and citations omitted). To state a *prima facie* claim for disparate treatment, the court explained, plaintiff must plausibly allege: "(1) membership in [a] protected class, (2) . . . plaintiff applied and was qualified to rent or purchase housing; (3) . . . plaintiff was rejected, and (4) . . . the housing thereafter remained open to similarly situated applicants after . . . plaintiff was rejected". *Id.* at 910–11 (citations omitted). Because plaintiff pleaded only "vague and conclusory allegations of disparate treatment", our court concluded plaintiff asked it "to automatically view a 'no voucher tenants' policy as synonymous with a 'no black tenants' policy without providing adequate (well-pleaded) factual support for that linkage", which our court would not do. *Id.* at 911.

## A.

For its disparate-impact claim, ICP asserts, *inter alia*, *Lincoln Property* should be reversed or modified, including being modified to protect the rights of private property owners (as noted, landlords).

No. 19-10991

1.

First addressed is whether *Lincoln Property* should be reversed or modified regarding disparate-impact liability.

a.

ICP primarily contends: *Lincoln Property* conflicts with *TDH* regarding a disparate-impact claim; the amended complaint states a *prima facie* case under *TDH*; and "the current Fifth Circuit standard is not justified by existing law and should be reversed or modified". ICP further states: "[t]he grounds for this argument are set out in the dissenting opinion[] in *Lincoln Prop.* . . . and the [subsequent] opinion dissenting from the denial of the petition for rehearing en banc". And, in its statement of the issues it presents for review, ICP states: "ICP's argument on this issue is made for the purpose of seeking further review of the current Fifth Circuit standard for pleading a disparate impact claim under 42 U.S.C. § 3604 on the grounds [it] is not justified by existing law and should be reversed or modified". In the "argument" section of its brief, ICP repeats this statement, nearly word-for-word.

As discussed *supra*, *Lincoln Property* read "robust causation" to require either: "a change in the defendant's enforcement of [a] policy" caused a disparate impact; or a challenged policy "caused [the relevant minority group] to be the dominant group" of those affected by the policy. *Id.* at 906 (emphasis omitted); *see also id.* at 921 (Davis, J., concurring in part and dissenting in part). ICP does not allege either of these scenarios. Rather than distinguishing this case from *Lincoln Property* in any meaningful way, ICP merely contends *Lincoln Property*'s disparate-impact standard, on which the district court relied in this action, "conflicts with the standard for disparate impact pleading and proof establish[ed]" in *TDH* "and should be reversed or modified".

No. 19-10991

*Lincoln Property*'s conclusion has been forcefully criticized by two members of our court.  *Id.* at 912–25 (Davis, J., concurring in part and dissenting in part); *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660, 661–67 (5th Cir. 2019) (Haynes, J., dissenting from denial of rehearing en banc).  In any event, "[o]ne panel of [our] [c]ourt cannot disregard the precedent set by a prior panel, even [if] it conceives error in the precedent.  Absent an overriding Supreme Court decision or change in the statutory law, only the [c]ourt en banc can do this".  *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976) (citations omitted).  Restated, and speaking specifically to the assertions made in this appeal, "[e]ven if persuaded that our [court's] prior panel opinion is inconsistent with an earlier Supreme Court opinion, we may not ignore the decision, for in this circuit one panel may not overrule the decision of a prior panel".  *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) (alterations and citation omitted).

In short, insofar as ICP requests this panel disregard or modify *Lincoln Property*, we are not permitted to do so.

b.

Beyond requesting reversal or modification of *Lincoln Property* on disparate impact, ICP briefly contends in its opening brief on appeal that "[t]he no voucher policy is arbitrary, artificial, and unnecessary".  (Emphasis omitted.)  ICP, however, cites no authority explaining why this is so or why, if true, it would be relevant.  Any contentions ICP could have made in this regard are, therefore, waived due to insufficient briefing.  *See* Fed. R. App. P. 28(a)(8)(A) (requiring appellant's brief contain, *inter alia*, "appellant's contentions and the reasons for them, with citations to the authorities . . . on which appellant relies").

No. 19-10991

In its reply brief, ICP briefly changes tack and asserts it satisfies *Lincoln Property* because: *Lincoln Property* "required a showing that the policy diminished . . . rental opportunities for Black tenants from those previously available"; and ICP pleaded in its operative complaint "that the policy will reduce . . . housing opportunities . . . for voucher families by at least 96 units". Generally, "[appellant's] original brief abandons all points not mentioned therein". *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1539 n.14 (5th Cir. 1984) (alteration in original) (citations omitted). That said, we "view[] the situation differently when[, as in this instance,] a new issue is raised in the appellee's brief and the appellant responds in his reply brief" and have "exercise[d] our discretion to address" an issue's merits under such circumstances. *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009) (citations omitted).

Although that exception applies here, to the extent *Lincoln Property* requires alleging diminishment of rental opportunities for minorities to plead a disparate-impact claim, such an allegation alone does not satisfy robust causality. *See Lincoln Prop.*, 920 F.3d at 907. And, ICP's plausible allegations do not meet *Lincoln Property*'s other requirements, identified *supra*. *See id.* at 906.

Finally, to the extent ICP, for the first time at oral argument, advanced new contentions regarding ICP's satisfying *Lincoln Property*, it goes without saying that we do not address them. *See, e.g.*, *Comsat Corp. v. FCC*, 250 F.3d 931, 936 n.5 (5th Cir. 2001) ("Arguments presented for the first time at oral argument are waived." (citation omitted)).

2.

ICP next contends "[t]he *Lincoln* standard . . . should be modified to protect the choice of private owners [the landlords] from regulatory

14

No. 19-10991

infringement of their right to choose to rent to voucher families". (Emphasis omitted.) Before addressing the merits of ICP's claim, and because our court must ensure our jurisdiction *sua sponte* if necessary, we must consider ICP's Article III standing *vel non* to vindicate this interest. *See, e.g., Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002) (citation omitted).

To have such standing, an individual must have, *inter alia*, an "injury in fact" that is "concrete and particularized", and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision". *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). Applying that standard to an association, it may bring an action on its members' behalf "when: (a) its members would otherwise have standing to sue on their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit". *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). ICP's amended complaint bases its standing on, *inter alia*, its "close, essentially representative relationship with its [voucher] clients". In that regard, its associational standing to bring both its disparate-impact and disparate-treatment claims, asserting *voucher holders'* rights to be free from discrimination, is beyond dispute.

Not so for the private owners (the landlords). For starters, ICP conceded at oral argument it lacks standing to pursue an action on behalf of Heartland landlords. Yet, in requesting modification of the *Lincoln Property* standard, ICP's brief seeks to transcend voucher holders' interests, asserting it "seek[s] to remove quasi-governmental restrictions unreasonably preventing private owners from providing affordable housing" to "protect the choice of private

No. 19-10991

owners from regulatory infringement". (Emphasis omitted.) Because ICP's "members", who are renters, would not have standing to vindicate private owners' property rights, in that any injury to those rights is not particularized to them, ICP lacks associational standing to do so. *See Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F. 3d 358, 366 (5th Cir.) ("Standing is not dispensed in gross; a party must have standing to challenge each particular inadequacy [at issue].") (alteration, internal quotation marks, and citation omitted), *cert. denied*, 139 S. Ct. 211 (2018). (ICP contends its amended complaint satisfies *Lincoln Property* because it satisfies footnote 11 in that opinion. The footnote states in part: "similar logic imposes a heavier pleading burden on [plaintiff's] efforts to require *private* defendants to take . . . *affirmative* action". *Lincoln Prop.*, 920 F.3d at 908–09 n.11 (emphasis in original). Because ICP lacks standing, we need not address this contention. In any event, *Lincoln Property*'s holding in no way depended on footnote 11.)

B.

In its amended complaint, ICP pleaded its 42 U.S.C. § 1982 and 42 U.S.C. § 3604(a) disparate-treatment claims together, without differentiation. Further, the district court discussed the two claims jointly, concluding ICP's failure to sufficiently allege HCA's having a discriminatory motive was fatal to both. *See Heartland Cmty. Ass'n*, 399 F. Supp. 3d at 669–70. On appeal, ICP acknowledges the two disparate-treatment claims are considered together because they are governed by the same standard. We consider them together as well. *See, e.g.*, *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007) (citations omitted); *see also Lincoln Prop.*, 920 F.3d at 911–12.

For ICP's assertion its amended complaint stated a disparate-treatment claim for Rule 12(b)(6) purposes, and as discussed, to state a disparate-treatment claim under 42 U.S.C. § 3604(a) based on circumstantial evidence,

16

No. 19-10991

ICP must plausibly allege "a prima facie case of [its clients'] (1) membership in [a] protected class, (2) that [they] applied and [were] qualified to rent or purchase housing[,] (3) that [they were] rejected, and (4) that the housing thereafter remained open to similarly situated applicants after [they were] rejected". *Lincoln Prop.*, 920 F.3d at 910–11 (citations omitted).

As discussed *supra*, our court in *Lincoln Property* rejected plaintiff's claim that a "no voucher tenants" policy was motivated by race discrimination after determining plaintiff "essentially ask[ed] the panel to automatically view [such a] policy as synonymous with a 'no black tenants' policy without providing adequate (well pleaded) factual support for that linkage". *Id.* at 911. In this instance, stating ICP relied on "the precise conclusory, conjectural, and speculative allegations . . . rejected in *Lincoln Property*", the district court concluded "ICP failed to make a prima facie showing of discriminatory intent" and dismissed ICP's disparate-treatment claim. *Heartland Cmty. Ass'n*, 399 F. Supp. 3d at 670.

As an initial matter, ICP does not satisfy the elements required to state a *prima facie* disparate-treatment claim:  it fails to plausibly allege any Heartland housing would be available to similarly situated renters after the policy's enactment because no voucher holders of any race will be able to rent in Heartland.  ICP's allegation that 32% of black and 53% of white renter households will still be able to afford to rent in Heartland, despite the policy, does not satisfy the fourth element of the *prima facie* test because these renters are dissimilar from voucher holders:  they can afford rent without a voucher.

Also unavailing is ICP's contention that this case is similar to *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  Both *Yick Wo* and *Gomillion* involved obvious evidence of

17

No. 19-10991

overwhelming race-based discriminatory treatment. *See Gomillion*, 364 U.S. at 340–41 (state legislature redefined city's boundaries, "transform[ing] it into a strangely irregular twenty-eight-sided figure" and "remov[ing] from [it] all save four or five of its 400 [black] voters while not removing a single white voter or resident"); *Yick Wo*, 118 U.S. at 373–74 (some 200 Chinese launderers denied ability to practice occupation but 80 non-Chinese launderers permitted to do so). By contrast, although, as alleged, all of the voucher residents disadvantaged by HCA's policy are black, ICP did not allege HCA removed all black residents (similar to *Gomillion*). And, ICP has not alleged black voucher holders have been denied housing in Heartland while white voucher holders have been allowed to rent there (similar to *Yick Wo*).

Additionally, *Arlington Heights* was decided after a bench trial, 429 U.S. at 259, while ICP appeals a Rule 12(b)(6) dismissal (failure to state claim). In any event, ICP's reliance on a comparison of the cases is unavailing. In *Arlington Heights*, the court considered evidence, including "[t]he historical background of the decision", "[t]he specific sequence of events leading up to the challenged decision", and "[t]he legislative or administrative history" behind the decision. *Id.* at 267–68. Further, it examined official minutes of meetings and analyzed a series of hearings before determining there was no evidence of discriminatory motive. *Id.* at 269–70. ICP alleged nothing comparable. Rather, it alleges: the number of black voucher households in Heartland increased each year, followed by an unexplained change in policy disallowing voucher rentals.

Finally, ICP contends HCA's failure to provide reasons behind the policy is circumstantial evidence of discriminatory intent supporting its disparate-treatment claim. In its operative complaint, however, ICP provides HCA's answers regarding its motives for limiting the number of rental houses

No. 19-10991

generally available in Heartland in which HCA stated it sought to, *inter alia*: preserve the feeling of a tight-knit community; ensure residents remained involved with local committees and boards; and prevent Heartland house prices from becoming untenable for first-time house buyers.  In addition to preventing voucher rentals, as discussed *supra*, HCA also limited the number of rental houses a houseowner may possess to one and required the houseowner live in it "for more than 12 consecutive months" prior to its being used as a rental.

Taken together, HCA's rules and the reasoning behind them state HCA's overall preference for house owners, as opposed to renters.  Needless to say, renters do not constitute a protected class under the FHA.  *See* 42 U.S.C. § 3604(a).  Along that line, neither is one's economic status or being a voucher holder.  *See id.*

Although HCA did not provide specific reasons underlying its decision to limit renting to voucher holders in Heartland, the limitation on voucher rentals is consistent with HCA's limiting overall rentals in Heartland, for which it provided reasons.  Further, although refusal to explain a policy decision may be "relevant" in determining the existence of discriminatory intent *vel non*, *see Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016) (en banc), it is not dispositive.  Regardless, because ICP did not allege HCA knew the number and racial composition of voucher households, ICP, in effect, asks our court to view a no-voucher-tenants policy as synonymous with a no-black-tenants policy, which is foreclosed by *Lincoln Property*.  920 F.3d at 911.

III.

For the foregoing reasons, the judgment is AFFIRMED.

No. 19-10991

HAYNES, Circuit Judge, specially concurring:

I strongly disagree with the outcome in this case, but I concur in the judgment. Why? Because I am bound by the rule of orderliness. *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). "[E]ven if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void."[1] *Id.* The ironically named *Lincoln Property* case is wrongly decided, but our court denied rehearing en banc, and the Supreme Court denied certiorari. *Inclusive Cmtys Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019), *reh'g denied*, 930 F.3d 660, *cert. denied*, 206 L. Ed. 2d 462 (2020). As much as I disagree with that case, I am strongly committed to the rule of law which requires me to follow binding precedent. So, applying *Lincoln Property* to this case, I concur solely in the judgment of affirmance.

That said, this case further illustrates the deficits in *Lincoln Property*. *See* 920 F.3d at 912-25 (Davis, J. dissenting in part) and 930 F.3d at 661-67 (Haynes, J., dissenting from denial of rehearing en banc). Heartland Community Association, with no explanation, has passed a rule the relevant portion of which has the disparate impact of banning *only* persons of color given the facts of this case: that all of the voucher owners in question are persons of color.[2] It did so despite the fact that the homeowners are willing to lease their homes to these voucher holders. It also did so in the same paragraph as its ban on renting to sex offenders and tenants with a history of evictions, two very different categories from the one at issue here. On appeal, there are vague suggestions that this allows for more consistency by diminishing the number

---

[1] Of course, an intervening change in the law (by a statutory change, a Supreme Court opinion, a state supreme court decision on a question of state law, or an en banc opinion from our court) creates a different situation, but that is not present here.

[2] The rule does not affect homeowners, only voucher holder renters.

No. 19-10991

of renters, but Heartland Community does not deny that it did not give any explanation regarding rentals to voucher holders and, specifically, why it lumped voucher holders in with sex offenders and repeat evictees.

The facts of this case raise deep questions about the motivation for the rule and should support a finding of disparate impact, but the effect of *Lincoln Property* means we cannot delve deeper here. It illustrates the concerns I (as well as the other six judges who joined my dissenting opinion from the denial of rehearing en banc) had about the impact of *Lincoln Property* in a circuit "full of large cities[3] that contain numerous locations housing large, minority population." 930 F.3d at 661. It also illustrates the "hampering enforcement of the FHA" caused by *Lincoln Property*. *Id.* at 667. As a result, we now have a "heartland" that excludes a large category of persons of color without explanation and with impunity. While I must concur in the judgment under the rule of law, I am hopeful that this defect in our caselaw will be cured sooner rather than later.

---

[3] While Heartland, Texas, itself is not large, it is less than a thirty minute drive from Dallas, Texas, a truly "large city," and Heartland is part of the huge "DFW Metroplex."